## KANSAS PACIFIC RLY. CO. v. NICHOLS, KENNEDY & CO.

1. AMENDMENTS; *Parties; Striking out Names of Plaintiffs.* It is not error for the court to allow during the trial, on motion of the plaintiffs, the name of one of the plaintiffs to be stricken from the proceedings and the cause to proceed in favor of the other plaintiffs.

2. PARTIES—*Defect of.* The question of a defect of parties plaintiff must be raised either by demurrer or answer.

3. RAILWAY COMPANIES; *Common Carriers; Liability.* Whenever a railroad company receive cattle or live stock to be transported over their road from one place to another such company assume all the responsibilities of a common carrier except so far as such responsibilities may be modified by special contract.

4. DAMAGES; *Gross Amounts; Interest of Plaintiffs.* Where in an action for damages the evidence shows that the plaintiffs' cattle had been turned loose by the defendant with another lot of cattle belonging to a different firm, and shows also the loss of a certain number of head of the two lots of cattle so turned loose together, and a gross sum paid for recapturing

others of them, but there is no proof showing or tending to show whether the cattle lost, or any of them, and the cattle recovered, or any of them, belonged to the plaintiffs, *held*, that a charge of the court to the jury, that they might assess the plaintiffs' damages for the cattle lost and for the cost of recovering the others *pro rata*, as to the whole amount of such damages, as the number of the plaintiffs' cattle were to the whole number of the cattle belonging to both firms, was erroneous.

5. PRACTICE; *General Exceptions.* A general exception to a whole charge is insufficient if any portion of the charge is correct; but where the record of the exception reads as follows, to wit: "To the giving of which instructions and to *each and every portion* thereof said defendant by its counsel *then and there duly excepted*," the supreme court will presume that exceptions were duly taken to each and every portion of the charge separately. Such has been the uniform practice of this court.

*Error from Douglas District Court.*

ACTION brought by *Nichols, Kennedy & Co.* to recover damages for cattle lost and injured through carelessness and negligence of the railway company. The petition alleged that the *K. P. Rly. Co.* were "common carriers of cattle and freight for hire," and that the plaintiffs had shipped over defendant's road, from Abilene to State Line, a lot of cattle, and that "while said cattle were in the care, custody, and keeping of said defendant, they so carelessly, negligently and improperly conducted themselves in regard to the same that said cattle were turned at large, and escaped," etc., claiming damages for the loss of twenty-one head, for the expenses incurred in recapturing others, and for injuries by reason of delay, loss, etc. The answer was a general denial. The case was tried at the February Term 1871. The opinion contains a sufficient statement of the facts, and of the questions arising on the trial. The plaintiffs asked the following instructions which were given, and to each of which the railway company excepted:

"1st. If the jury believe from the evidence that the defendant took the cattle of the plaintiffs to convey to Chicago, and that the road of the defendant formed one of the connecting roads in the route from Abilene to Chicago, and that it was the understanding with plaintiffs and defendant that the cattle should be in the custody of the defendant and the different connecting roads, and that through the neglect

of the defendant, or its servants, either in not furnishing suitable yards to hold the cattle at the customary place of unloading and reloading at the end of the defendant's road, or in not providing sufficient means to carefully keep the cattle and turn them over to the next railroad company, the plaintiffs lost any cattle, or that the cattle of the plaintiffs were injured by needless delays caused by defendant, then the jury should find for the plaintiffs the value of the cattle lost, and the injury or loss in value to the remaining cattle caused by such delay.

"2d. If the jury find that the plaintiffs were put to costs and expense in holding and gathering the cattle scattered or lost by defendant's neglect, or want of suitable provision to hold said cattle for the next carrier, they may find for the plaintiffs the costs of such expenses.

"3d. It was the duty of the defendant, if it undertook to transfer the cattle of the plaintiffs to Chicago, to furnish suitable means for yarding the same at the end of its road, if such was the custom of the defendant in carrying cattle; and it was its duty to carefully protect and handle the cattle of the plaintiffs, and to hand them over, as soon as the ordinary course of its business would permit, to the next road in the connecting lines.

"4th. If the jury should find that there was no through-contract to Chicago, but that the defendant took the cattle into its control to transport as one of the connecting roads in a line to Chicago, then it was the duty of the defendant to transport the cattle to the end of its road, and safely and as expeditiously as possible hand them over to the next carrier; and for any loss to the plaintiffs for not so doing by the defendant the plaintiffs are entitled to recover."

The *Railway Co.* asked the following instructions, which the court refused to give, and to the refusal the defendant excepted:

"1st. There has been a total failure of proof by the plaintiffs of the cause of action set forth in their petition, and hence you will find a verdict for the defendant.

"2d. The defendant is not at common law, or by statute, a common carrier of live stock; and unless the jury find from the evidence that the defendant contracted to transport the plaintiffs' cattle safely and expeditiously from Abilene to State Line, and then deliver them without delay to another

connecting carrier, and to insure their safe delivery, then the plaintiffs cannot recover.

"3d. The plaintiffs have failed to prove any contract with the defendant for the transportation of the cattle as set forth in the petition, and hence you must find for the defendant."

. The *Railway Co.* also asked the following instruction, which was refused as asked; but the court granted the first part, refusing the clause in parenthesis, and defendant excepted:

"4th. If the jury find that David Nichols and Harland Palmer, comprising the firm of Nichols & Palmer, owned and shipped ninety-seven head of the cattle in question, and they alone had any interest in them, then the jury, if they find for the plaintiffs, must find the damages sustained to that portion of the cattle other than the said ninety-seven head; (and if they cannot find from this evidence these damages separate from the whole lot, then they must find for the defendant.")

The court gave certain general instructions. A part of those relating to the apportionment of damages are copied in the opinion. The exception taken by the defendant to the general charge is as follows: "To the giving of which instructions, and each and every portion thereof, and the refusal by the court to give the instructions so as aforesaid asked by the defendant, said defendant by its counsel then and there duly excepted." The jury found for the plaintiffs, and assessed their damages at $1,850. New trial refused, and judgment on the verdict. The *Railway Co.* brings the case here on error.

*J. P. Usher*, and *E. W. Dennis*, for plaintiff in error:

1. The judgment ought to be reversed because it appears from the evidence that there is a defect of parties plaintiff. Nichols, one of the plaintiffs, testified on cross-examination that another person was interested. We quote from the record: "Q.—Were these all the parties? A.—Bryson had an interest in shipping those cattle." The plaintiffs amended by dropping the names of Palmer and Parvin, but did not add that of Bryson. This was not of the class of cases

where the defect of parties appears in the petition and could be made ground of demurrer. Nor is it a case where the defendant could know who composed the firm, or who the parties in interest were, and state the defect in their answer.

2. It appears from the testimony of Palmer that the only contract made was with respect to the shipping of the 97 head belonging to "Nichols & Palmer." There is no proof of any contract with "Nichols, Kennedy & Co.," nor for the shipping of their cattle. These cattle were put into the yard of the only road connecting with the defendant, and at its eastern terminus. That was all the defendant could do. It was under no contract, express or implied, with the plaintiffs to transport plaintiffs' cattle beyond its line of road; and it was not the fault or negligence of the defendant that the cattle were turned out of the stock-yard, and allowed to stray away.

*Wallace Pratt,* also for plaintiff in error:

1. The petition sets forth but a common-law liability. There is no special agreement set out in the petition, whereby the plaintiffs in error undertook and agreed, either as common carriers or forwarders, to transport the cattle of the defendants in error to Chicago. There being no through contract set forth, the petition is simply good as a basis of recovery, where there has been a breach of a common-law obligation; and it was error to admit evidence tending to prove a contract to transport cattle to Chicago. What did plaintiff in error undertake and agree to do? What was its duty as a common carrier as set forth in the petition? The petition answers: "To safely transport said cattle from Abilene to the point of connection of their road with the railroad aforesaid, (connecting road,) and transfer the cattle to such other roads to be by them carried by way of Quincy to Chicago." Not that plaintiff in error was to *carry* by the connecting road to Chicago by way of Quincy—but was to *deliver* to such connecting road the cattle, by said connecting road to be carried to their destination.

As to what is, and what is not sufficient proof of a contract to constitute a party as common carrier, etc., what proves a holding out to the public a party as common carrier, is fully commented upon in *Anthony v. U. S. Express Co.*, 5 Kas., 490. In the Anthony case there was *some* proof of the Express Company holding itself out as carriers; but in the case at bar there was none as to the kind of business the company was doing, beyond the statement of a witness that they shipped cattle, etc. No proof offered such as this court holds necessary in the Anthony case. By accepting the stock without a contract express, the plaintiff in error was liable to a safe and prompt delivery at the end of their road, and this was done. Beyond this there must be a contract express; that must be alleged, and then proven. A failure to allege and prove, or being alleged and not proven, defeats a recovery.

2. There was no special contract of any kind proven or attempted to be proven, in regard to the transportation of the cattle of defendant in error, to wit, 198 head. If this be true (and the record confirms the statement) there was no obligation beyond the safe delivery of the cattle at the State Line, in the yards of plaintiff in error and those of a connecting line, which obligation was complied with.

What was the proof of a contract? It is by one witness— Palmer—and his evidence showed a contract for the ninety-seven head of cattle belonging to Nichols & Palmer. The fact that the 198 head belonging to Nichols, Kennedy & Co. were shipped on same train, proves nothing. Palmer's evidence proves but the ordinary transaction in like cases. He asks the station agent the price per car to State Line, the price of loading, and the price from State Line to Chicago *via* Quincy, and how long it would take to run through. The agent tells him, and this is all. Now whatever this proves only applies to the ninety-seven head, Palmer distinctly testifying that he "had only to do with his own, the ninety-seven lot." There was not a *scintilla* of proof competent or incompetent as to the 198 head of defendants in error being shipped under a

special contract to transport to Chicago. When there is *no evidence* to sustain an allegation the court shall so instruct the jury, and the court was asked so to do, but refused. 1 Kas., 303, 309, 311; 3 Kas., 489; 4 Kas., 206; 43 Ill., 119.

3. The undertaking to transport and deliver the stock at the end of the road of plaintiff in error, as was set forth in the petition, was fully carried out in law, by delivering the stock in the yards of the company and those of the connecting line at State Line. All the evidence admits that they were thus delivered, and in good order. There being no question raised by the evidence, or by the party, the fact of their delivery in the proper yards standing admitted, the court should have instructed the jury, as requested by the counsel for plaintiff in error, "That there had been a total failure of proof," etc. And as there was no through contract proven as to the 198 head, this instruction should have been given, even though the petition would warrant the proof of such a contract. The refusal of the court was error.

4. If the contract set out in the petition be one by which plaintiff in error was to transport the cattle of defendants in error to Chicago, as claimed, there was an utter failure of proof as the property of the defendants in error, to wit, the 198 head, and the court should have so instructed the jury when requested so to do.

5. The court erred respecting the law and the proof of damages, in its general charge, especially as to what "the jurisprudence of this country establishes," and as to the "exactly two-thirds" proposition, and as to "sharing the loss, etc., with other parties." If these instructions by the court below are law we have yet to learn it. We think they were erroneous. And in the comprehensive language of this court in *Elliott v. Corum,* 5 Kas., 614, "it is the right of a party to have his case submitted to the consideration of the jury under proper instructions; and when incorrect instructions are known to have been given, a reviewing court will not undertake to say that they did not operate to the injury of the party against whom they were so given, unless such fact is made clearly to

appear." .This principle, (though not always so aptly expressed,) is recognized by all appellate courts.

Again: "If an instruction is so obscure and confused that it is calculated to mislead, it is erroneous." *Haskins v. Haskins*, 41.Ill., 197.

Now apply the rules above enunciated to the instructions of the court below. The court says, "and although there may be *no evidence* especially to the point that this railway company was a common carrier, yet at the same time I think it is sufficiently well established by the jurisprudence of this country; the fact that it is a railway company of this country makes it a common carrier, without the special fact before the jury." This is lucid—"no proof necessary, not even the special fact need be before the jury." But see the impression this charge may and must have given the jury. *Without* evidence plaintiff in error must be treated as a common carrier, and as such liable. Liable for what? The damages that defendants in error sustained by not transporting stock to *Chicago*—when, as such, without a special contract to that end, it was only bound to carry over its own route to the end thereof. The *liability* of a common carrier, where there was no special contract, should have been explained to the jury; but as it was given, the jury was misled.

Again, this language is held by the court: "If there is any evidence before you of these cattle at Arlington, or at any other point where they were shipped, to the effect that Nichols, Kennedy & Co., shared with Nichols & Palmer the loss of the 21 head equally, or the loss of 21 head equally in the same ratio with the number of cattle that each partnership actually owned, then you can probably arrive at the result by taking the *pro rata*." Not a syllable of evidence or any inference from evidence that plaintiffs shared .the loss with Nichols & Palmer—or that the plaintiffs and N. & P. even lost these 21 head. Twenty-one head were lost; whose were they? We *guess* they were Nichols & Palmer's, part of the small lot, not before the jury. Defendants in error *guess* the other. As the fact was not proven, the guess is against the

defendants in error. The evidence must show that they were the plaintiffs'. They cannot share in other people's loss and then charge us. But the point is, there was no evidence even to the fact of sharing. And a similar error was committed in the instruction that if the jury should find that defendants in error "owned exactly two-thirds of the number charged in the complaint, and that the whole number mentioned, 295 head, were put together in the yard and escaped together, then in that case it may be competent for the jury to say that the cost of recovering these cattle, if it was $210, or any other sum, should be charged *pro rata*," etc. This certainly is not the law of this case. It tended to mislead the jury. The jury could not "find" any such fact, because 198 is not "exactly two-thirds of 295," and because there was no proof that the 21 head lost, or any of them, belonged to defendants in error.

6. The second instruction asked by plaintiff in error should have been given, to wit, "that the defendant is not at common law, or by statute, a common carrier of live stock." 21 Mich., 165.

7. The motion for a new trial, and the exceptions taken below, saved all the questions of irregularity in the proceedings at the trial, and the motion should have been granted. Improper evidence was admitted; there was no testimony to sustain the verdict; the court erred in refusing the instructions asked by plaintiff in error, and in the instructions given. 1 Gra. & Wat. on New Trials, 283; 21 Barb., 489; 1 Kas., 311.

*Thacher & Banks*, for defendants in error:

1. Do the facts proven entitle the plaintiff to recover? The plaintiffs claim that defendants are common carriers, and as such they took the plaintiffs' cattle to transport either to Chicago, or to the terminus of their road, there connecting with another road. As common carries they were insurers, and could only discharge themselves of responsibility by a delivery of the property, or by showing its loss by inevitable

accident, or the act of God. If their contract was to carry only to the end of their road, they could then discharge their liability, only by delivery to the connecting line; or by giving notice to such line, and in case of their failure to receive, by placing the property in some safe and secure place: 20 N. Y., 259; 34 N. Y., 497.

That railroads are common carriers is settled by the very nature of their business, and by the way they hold themselves out to the world. A common carrier is defined as "a person who undertakes generally, and not as a casual occupation, and for all people indifferently, to carry goods and deliver them at a place appointed." 2 Kent's Com., 828. They are responsible for the safety of animals delivered to them for transportation; and the rule applies to railroads. Angell on Com. Car., §§ 108, 214.

A railroad company that transports cattle for hire for such persons as choose to employ them, thereby assume and take upon themselves the relation of common carriers, and with the relation, the duties and obligations that grow out of it, and they are none the less common carriers from the fact that the transportation of cattle is not their principal business. Angell on Com. Car., § 78; 26 Vermont, 247; 31 Ind., 394, 397; 18 Mich., 427; 31 How. Pr. Rep., 453. Where no usage to the contrary is shown, and the carrier receives an article and undertakes to deliver it, it will be presumed that such is his customary employment. 11 Mo., 227; 13 Iowa, 401.

But the defendants are insurers, and their duty as such continues until they have turned the property over to the connecting line. Instead of observing their obligations in this respect they were guilty of gross negligence. The cause of action was well proven, and the damages are not excessive.

2. One of the grounds stated in motion of plaintiff in error for a new trial is given in the words of the statute—for "errors of law occurring at the trial and which were duly excepted to by the defendant." Now an objection must be taken or a motion must be made in a manner to direct the

attention of the court to the precise point upon which it is desired the court shall decide. It is not sufficient that the party says "I object." He must state the precise point of objection. If he moves the court, he must inform it of the precise reason for the order which he asks. If it is to correct an error, he must specifically point out that error. Here he utterly fails to do so, but states generally, that the court below committed an error which the party excepted to, and asks the court *to find it*, and grant a new trial. The court was not bound to hunt for error. 5 N. Y., 442; 7 N. Y., 266; 18 N. Y., 448; 35 How. Pr., 416; 50 Barb., 407; 34 N. Y., 383; 8 Ohio, 507.

To the charge of the court as given, independent of the specific instructions asked, there seems to have been no competent exception for the court to review the particular points charged upon, and if any legal proposition embraced is correct, the exception must fall. That some part of the charge is correct, will not probably be controverted. The case shows that the defendant excepted to the charge and instructions, and to each and every portion thereof. Only in relation to the instructions specifically asked for by plaintiff, does the defendant point to any particular matter to which he excepts. He does not call the mind of the court to the particular idea which he deems erroneous, and give the court the opportunity, if there be error, to correct the error and properly direct the jury: 11 N. Y., 416; 2 Selden, 233; 5 Denio, 213; 2 Kernan, 313; 4 Kernan, 310, 436; 50 Barb., 407; 7 N. Y., 266; 9 Wis., 129; 13 Wis., 495; 11 Wis., 160; 16 id., 224; 18 id., 273. This rule has been affirmed by statute in this state. Section 276 of the code provides that "a party excepting to the giving of instructions, shall write at the close of *each* instruction," etc.

But the charge was substantially correct; so correct, at least, that defendant could then point out no error to the court of which to complain, and he should not now be heard to allege any.

3. The first instruction asked by defendant below was a pro-

posal to dispense with the office of the jury, and in their stead to substitute the court. The court very properly declined so to do. Neither is the second proposition more tenable. It is a proposition embracing several distinct matters, and unless the whole proposition is correct, the court properly refused it. 9 Wis., 202; 19 Ohio, 337.

Whatever the court may think of the question as to whether the defendants are common carriers of cattle, of which the plaintiffs believe there is not much doubt, in view of the authorities before cited, it is insisted that there can be no doubt but that the proposition that "unless the jury find from the evidence that the defendants *contract* to transport the plaintiffs' cattle safely and expeditiously from Abilene to State Line and then deliver them without delay to another connecting carrier, and to *insure* their safe delivery, then the plaintiffs cannot recover," is wholly untenable. The defendants might be liable in this action, although their contract contained no express agreement to insure. They might be liable for gross negligence, or even for ordinary neglect, although the contract was far less explicit than stated in the instruction, and whether they were common or private carriers.

The defendants did receive the cattle to carry. Of that there is no question. They were bound to exercise some kind of care over them. If they failed in the exercise of that care, they are liable in this action. If they placed them in stock yards, they were bound to see that they were rightfully there, and not trespassers. They were bound that the persons in charge, *quoad hoc* their servants, should not turn them loose.

The instructions asked were, that this was a matter or right secured only by *special contract*, instead of a duty imposed by law—that without proof of such express contract in terms, the party had no redress for his loss, whereas proof of a delivery to, and acceptance by defendants of the cattle, for purposes of carriage, whether in one relation or the other, imposes upon defendants the duty of some degree of

diligence. The instruction asked would only impose diligence when it was specially contracted for.

A request to charge should be in such language that the court may charge in the very terms of the request. The judge is not required to separate a proposition, and pick out what is good and refuse the rest. 24 How. Pr., 172; 11 N. Y., 61; 43 Barb., 448.

4. To the fourth instruction not given and excepted to by defendants, it is answered that there was no case calling for the instruction. The damages were clearly proven. The plaintiffs were proven to have lost 21 head of cattle.

If there was a joint expense as to the cattle of these plaintiffs and those of Nichols & Palmer, then the presumption is, that the expense was proportioned according to their interests respectively. 20 Barb., 479; 20 Pick., 479. But there is no express proof that the cattle of Nichols & Palmer were turned loose or mixed with those of the plaintiffs. It was, however, assumed by the judge to be the fact.

5. The court correctly ordered the pleadings amended by striking out the names of parties who had no interest in the event of the action. The defendants had interposed no defense based upon grounds affected thereby. They were not prejudiced, and the ends of justice were most clearly subserved.

The opinion of the court was delivered by

VALENTINE, J.: This action was commenced in the district court by David Nichols, Michael Kennedy, Henry Parvin, and Harland Palmer, as plaintiffs, against the Kansas Pacific Railway Company. It was alleged in the petition that said plaintiffs were partners, doing business under the firm-name of Nichols, Kennedy & Co. During the trial evidence was introduced tending to show that two of the plaintiffs, Henry Parvin and Harland Palmer, were not members of the firm at the time this action was commenced, and thereupon the court on motion of the plaintiffs struck their names from the proceed-

1. Amendments: striking out names of parties.

ings, and allowed the case to proceed in favor of the other two only. We see no error in this. (*Silvers v. Foster*, ante, p. 56.) Our code of civil procedure provides for just such cases, (§ 139, p. 655, § 396, p. 704,) leaving however a great deal of discretion to be exercised by the court trying the cause.

II. It is also claimed that there was a defect of parties plaintiff. We do not think however that the record shows any such defect. The only thing that tends to show it is a small portion of the testimony of the plaintiff Nichols, which reads as follows: "Bryson had an interest in *shipping* these cattle." We suppose further comment upon this question is unnecessary. But if there was a defect of parties plaintiff, as no objection was taken thereto, either by demurrer or answer, it must be deemed that the defendant below waived the same. Civil Code, § 91.

*2. Defect of parties; how question raised; waiver.*

III. The main question in this case is, whether the railway company, when it took the cattle of the plaintiffs below for the purpose of transporting them over its road, assumed the responsibilities of a common carrier or not. We think it did. This question has already been decided in this court in the case of the *K. P. Railway Co. v. Reynolds*, 8 Kas., 623. In the case of *Kimball v. The Rutland and Burlington Rld. Co.*, 26 Vt., 247, 254, et seq., the court decided that "A railway company that transport cattle and live stock for hire, for such persons as choose to employ them, thereby assume and take upon themselves the relation of common carriers, and with the relation the duties and obligations which grow out of it; and they are none the less common carriers from the fact that the transportation of cattle is not their principal business or employment." See also *Wells v. Pittsburg, Ft. Wayne & C. Rld. Co.*, 10 Ohio St., 65. In the case of the *Great Western Rly. Co. v. Hawkins*, 18 Mich., 427, 433, the supreme court of Michigan use the following language: "The company in this case must be regarded as common carriers, and liable as such,

*3. Railway companies are common carriers.*

·except so far˙as that liability was qualified by the special contract." The special contract just mentioned was a contract to transport nineteen horses from Paris, Canada, to Detroit, Michigan, and there is nothing in the contract or in the report of the case that tends to show that the company held themselves out as common carriers of live stock, or that they anywhere agreed or admitted that they were such carriers, and they carried these horses under a *special* contract.   See also the authorities cited in the brief of defendants in error, and 2 Redf. on Rlys., 4th ed., 144, note 2, and cases there cited; *Wilson v. Hamilton*, 4 Ohio St., 738; *Sager v. Portsmouth Rld. Co.*, 31 Maine, 228; *Clarke v. Rochester & Syracuse Rld. Co.*, 14 N. Y., 570; *N. M. Rld. Co. v. Akers*, 4 Kas., 453; *Keeney v. The Grand Trunk Rly. Co.*, 59 Barb.; *Wells v. Pitts., Ft. W. & C. Rld. Co.*, 10 Ohio St., 65.   It is claimed that a different doctrine has recently been held in Michigan: *Mich. Southern & Northern Ind. Rld. Co. v. McDonough*, 21 Mich., 165.   This is certainly true with respect to the railroad then under consideration by the court; but whether it is true with regard to all railroads in the state of Michigan is not so certain.   See pages 189, 198 and 199 of the opinion, and the comments of the court on the provisions of the charter of the Mich. Southern Rld. Co., and the act consolidating it with the Northern Ind. Rld. Co.   But if this decision does apply to all the railroads of Michigan as well as to the Michigan Southern & Northern Ind. Rld. Co., under its peculiar charter, does it in any manner indicate what the law is in Kansas?   We think not, or but very little at most. In Michigan, since April 1870 railroads have not been public purposes, or public uses, in the sense that they are such in the other states of the Union.   In that state they are purely and strictly private purposes or uses: *People v. Salem*, 20 Mich., 452, 475, 480, 485.   The supreme court of that state say that, "They (railroad companies) are public agents in the same sense that the proprietors of many other kinds of private business are, and not in any other or different sense."   "Our policy in that respect," say the court, "has changed; railroads

are no longer public works, but are private property." Railroads are private, according to that decision, in the same sense that the different kinds of business of hackmen, draymen, proprietors of stage coaches, merchants, newspaper proprietors, physicians, manufacturers, mechanics, hotel-keepers, millers, etc., are private. Railroads in Michigan seem from that decision to be such private corporations as are described in the case of *Leavenworth Co. v. Miller*, 7 Kas., 524, 535. If they are such private corporations as there described, of course they have a right to be common carriers of just such property as they choose, no more and no less. This is not so in Kansas. The railroads of Kansas are organized upon a different basis. In Kansas they are endowed with a kind of *quasi* public as well as private character. In Kansas they are so far public that the sovereign power of eminent domain may be exercised for their benefit, and they are so far public, that other public aid may be extended to them. It is believed that no railroad has yet been built in Kansas that has not been aided both by the exercise of the power of eminent domain, and by other public aid, such as lands and county or municipal bonds. Railroads are public purposes in no sense except in the sense of being common carriers of freight and passengers. It is true that there are incidental public benefits arising from the creation and operation of railroads, such as the increase in the value of property along their routes, the increase of the public revenues, etc., but these are only incidental benefits, and are not at all what make railroads public purposes. And this public character of railroads is stamped upon them at their very creation. It is stamped upon them by the sovereign power where it authorizes their coming into existence; for otherwise they could receive no public aid until the roads should be constructed and in operation, and until the roads should become public purposes by virtue of becoming common carriers of freight or passengers. And if they were created absolutely private corporations they could become common carriers only by holding themselves out as such, and by actually carrying freight or passengers. We suppose it

will not be contended that any kind of public aid could be extended to a purely private corporation. If a railroad company is created as a private carrier, and not as a public or common carrier, we suppose that no one will contend that the sovereign power of eminent domain could be exercised for its benefit in its construction, or that any public aid of any kind whatever could be extended to it. That railroads are *created* common carriers of some kind, we believe is the universal doctrine of all the courts. The main question is always, whether they are common carriers of the particular thing then under consideration. The question in this case is, whether they are common carriers of cattle. So far as our statutes are concerned no distinction is made between the carrying of cattle and that of any other kind of property. Under our statutes a railroad may as well be a common carrier of cattle as of goods, wares, and merchandise, or of any other kind of property. Now as no distinction has been made by statute between the carrying of the different kinds of property, we would infer that railroads were created for the purpose of being common carriers of all kinds of property which the wants or need of the public require to be carried, and which can be carried by railroads; and particularly we would infer that railroads were created for the purpose of being common carriers of cattle. As Kansas, and all the surrounding states and territories, with their boundless prairies and nutritious grasses, are destined to be, great stock-growing countries, it can scarcely be supposed that the legislature in providing common carriers for the property of the public should have omitted to provide for one of the most important kinds of property, a vast source of unbounded wealth. We have no navigable streams within the boundaries of Kansas upon which to transport cattle, and hence they must be transported by railroad, if transported by any means except by driving them on foot.

It is claimed however that "the transportation of cattle and live stock by common carriers *by land* was unknown to the common law." Suppose it was; what does that prove?

The transportation of thousands of other kinds of property, either by land or water, was unknown to the common law, and yet such kinds of property are now carried by common carriers, and by railroads, every day. We get our common law from England. It was brought over by our ancestors at the earliest settlement of this country. It dates back to the fourth year of the reign of James the First, or 1607, when the first English settlement was founded in this country at Jamestown, Virginia. The body of the laws of England as they then existed now constitute our common law. It is so fixed by statute in this state, (Comp. Laws, 678; Gen. Stat., 1127, § 3,) and is generally so fixed by statute or by judicial decisions in the other states. The reason why cattle and live stock were not transported *by land* by common carriers at common law, was because no common carrier at the time our common law was formed had any convenient means for such transportation. Among the other kinds of property not transported by common carriers, either by land or water, at the time our common law was formed are the following: reapers, mowers, wheat drills, corn planters, cultivators, threshing machines, corn shellers, gypsum, guano, indian corn, potatoes, tobacco, stoves, steam engines, sewing machines, washing machines, pianos, reed organs, fire and burglar-proof safes, etc.; and yet no one would now contend that railroads are not common carriers of these kinds of articles. At common law the character of the carrier was never determined by the kind of property that he carried. He might have been a private or special carrier of goods, wares, and merchandise, or of any other kind of property, or he might have been a public or common carrier of cattle, live stock, or any other kind of property, just as he chose. All personal property was subject to be carried by a common carrier, and no personal property was exempt. Whether a person was a common carrier depended wholly upon whether he held himself out to the world as such, and not upon the kind of property that he carried. A common carrier was such as undertook, "generally, and not as a casual occupation, and for all people indif-

ferently, to convey goods and deliver them at a place appointed, for hire, as a business, and with or without a special agreement as to price." 2 Kent's Com., 598. And he could hold himself out as a common carrier by engaging in the business generally, or by announcing or proclaiming it to the world by the issuing of cards, circulars, advertisements, etc., or by any other means that would let the public know that he intended to be a common or general carrier for the public. Railroads hold themselves out as common carriers by an act irrevocable on their part in their very creation and organization. The very nature of their business is such that by engaging in it or offering to engage in it they hold themselves out as common carriers. But let us return to the point more especially under consideration. At common law no person was a common carrier of any article unless he chose to be, and unless he held himself out as such; and he was a common carrier of just such articles as he chose to be, and no others. If he held himself out as a common carrier of silks and laces, the common law would not compel him to be a common carrier of agricultural implements such as plows, harrows, etc.; if he held himself out as a common carrier of confectionery and spices, the common law would not compel him to be a common carrier of bacon, lard, and molasses. *Funnel v. Pettijohn,* 2 Harrington (Del.,) 48. And it seems to us clear beyond all doubt, that if any person had in England prior to the year 1607 held himself out as a common carrier of cattle and live stock by land, the common law would have made him such. If so, where is the valid distinction that is attempted to be made between the carrying of live stock and the carrying of any other kind of personal property? The common law never declared that certain kinds of property only could be carried by common carriers, but it permitted all kinds of personal property to be so carried. At common law any person could be a common carrier of all kinds, or any kind, and of just such kinds of personal property as he chose, no more, nor less. Of course, it is well known that at the time when our common law had its origin, that is, prior

to the year 1607, railroads had no existence.   But when they came into existence it must be admitted that they would be governed by the same rules so far as applicable which govern other carriers of property. ⟋ Therefore it must be admitted that railroads might be created for the purpose of carrying one kind of property only, or for carrying many kinds, or for carrying all kinds of property which can be carried by railroads, including cattle, live stock, etc.   In this state it must be presumed that they were created for the purpose of carrying all kinds of personal property.   It can hardly be supposed that they were created simply for the purpose of being carriers of such articles only as were carried by common carriers under the common law prior to the year 1607; for if such were the case they would be carriers of but very few of the innumerable articles that are now actually carried by railroad companies.   And it can hardly be supposed that they were created for the mere purpose of taking the place of pack-horses, or clumsy wagons, often drawn by oxen, or such other primitive means of carriage and transportation as were used in England prior to that year.   Railroads are undoubtedly created for the purpose of carrying all kinds of property which the common law would have permitted to be carried by common carriers in any mode, either by land or water, which probably includes all kinds of personal property.   Our decision then upon this question is, that whenever a railroad company receive cattle or live stock to be transported over their road from one place to another such company assume all the responsibilities of a common carrier⟋ except so far as such responsibilities may be modified by special contract.

IV. It is claimed that the court below erred in instructing the jury with regard to damages.   The evidence showed that the firm of Nichols, Kennedy & Co. shipped 198 head of cattle, and that the firm of Nichols & Palmer shipped at the same time and on the same train ninety-seven head of cattle.   At Kansas City these cattle were all turned out together, and allowed to go at large.

*4. Damages; interest of plaintiff must be shown.*

Many of them strayed away. Twenty-one head of them were never recovered, but were totally lost; and it cost $210 to recapture the others. There was no evidence tending to show whether these twenty-one head that were lost belonged to one firm or the other, or how many of them belonged to one firm, or how many to the other. The plaintiffs in error, in their brief, "guess" they all belonged to the firm of Nichols & Palmer. The defendants in error (plaintiffs below) guess in their brief that they all belonged to Nichols, Kennedy & Co. The jury probably guessed, under the instructions of the court, that about two-thirds of them belonged to the firm of Nichols, Kennedy & Co., and that the other third belonged to the firm of Nichols & Palmer. Neither was there any evidence tending to show whose cattle strayed, so as to require cost to recover them back, or how much it cost to recapture the cattle of one firm, or how much it cost to recapture the cattle of the other firm. Under the charge of the court the jury probably assessed two-thirds of the cost against the railway company as belonging to the firm of Nichols, Kennedy & Co. If the evidence upon these two points had been clear and positive as to how many cattle, if any, Nichols, Kennedy & Co. lost, and as to how much, if anything, it cost this firm to recover the others back, the charge of the court would probably not have misled the jury, and would then not have been so erroneous as to require a reversal of the judgment, for the charge was not glaringly erroneous. The charge was more in its nature permissive than it was mandatory. But as there was no evidence upon these points, as there was nothing from which the jury could determine whether the whole twenty-one head of cattle that were lost, or some less number, or none at all, belonged to Nichols, Kennedy & Co., and as there was nothing from which the jury could determine whether the whole of said cost of recapturing said other cattle, to wit, $210, or some less sum, or nothing, fell upon Nichols, Kennedy & Co., any suggestion from the court upon these points, however slight, if it indicated a number or amount, might, and probably would, mislead the jury. As

to how much the jury assessed as damages for these two items. we cannot tell. It may have been for the whole twenty-one head of cattle, and the whole $210, or for a much less amount; we suppose about two-thirds. But whatever may have been the amount, there is nothing that we know of that would prevent the other firm of Nichols & Palmer from suing and recovering from the railroad company for the whole twenty-one head of cattle that were lost, provided they belonged to that firm, and for the whole of the $210 expended in recovering the other cattle, provided it was expended in recovering the cattle belonging to that firm. The objectionable instructions are as follows:

"In relation to the question of damages in this case it becomes necessary for you to determine the number of cattle owned by Nichols, Kennedy & Co.; and if you shall find that they owned exactly two-thirds of the number charged in the complaint, and that the whole number mentioned, 295 head, were put together in the yard and escaped together, then, in that case it may be competent for the jury to say that the costs of recovering these cattle, if it was $210 or any other sum, should be charged *pro rata* according as the whole number of cattle belonging to Nichols, Kennedy & Co. corresponded with the whole number herded together." "If there is any evidence before you of these cattle at Arlington or any other point where they were shipped, to the effect that Nichols, Kennedy & Co. shared with Nichols & Palmer the loss of 21 head equally in the same ratio with the number of cattle that each partnership actually owned, then you can probably arrive at the result by taking the *pro rata*."

There was no evidence that the two firms at Arlington or elsewhere shared in the loss of these 21 head of cattle or any other cattle, *pro rata*, or in any other manner whatever.

V. A general exception to a whole charge is of course insufficient if any portion of the charge is correct; but where the record of the exception reads as follows, to wit: "To the

5. Practice; general exceptions. giving of which instructions and to *each and every portion* thereof, (and to the refusal by the court to give the instructions so as aforesaid asked by the defendant,) said defendant by its counsel *then and there duly*

*excepted,"* the supreme court will presume that exceptions were duly taken to each and every portion of the charge separately. Such has been the uniform practice of this court. The court below also erred in refusing to grant the motion for a new trial. The judgment is reversed, and cause remanded for a new trial.

All the Justices concurring.