R. M. SNYDER v. J. C· STRIBLING,

(Filed February 13, 1907.)

1. **VERDICT—Not Disturbed, When.** Where a cause is tried to a jury and the jury under proper instructions returns a general verdict and also makes special findings of fact consistent with the general verdict and there is evidence reasonably tending to support the verdict and special findings, the court will not disturb the verdict upon the weight of the testimony.

2. **JURY—Question of Fact.** It is not error to submit a question of fact to the jury under proper instructions where there is any evidence however slight, reasonably tending to support the proposition.

3. **·INSTRUCTIONS—Exceptions—Practice.** A general exception to a series of instructions by number severally and to each and every one of such instructions, is sufficiently specific to present to the court for review the correctness of each instruction mentioned in the exceptions.

4. **SAME—Slight Inaccuracies.** An instruction which contains a verbal inaccuracy will not be sufficient to invalidate a verdict where it is apparent that the jury could not have been misled thereby.

5. **SAME—Whole Charge Considered.·** Although an instruction given may mis-state the law, if others are given which when taken together with the improper one make it apparent that the jury was not misled thereby, the same will not constitute reversible error.

6. **JUDGMENT—Not Disturbed, When.** Although there may be some technical or immaterial errors committed in the trial of a cause if upon the whole record it is apparent that a correct conclusion was reached and a just judgment rendered, the judgment will not be disturbed.

7. **CONTRACTS—Time—Statutes Construed.** At common law time was always considered as of the essence of the contract. In equity time was never considred as of the essence of the contract unless by necessary implication or by express stipulation it was so provided in the contract. Our statute has abolished the common law rule as well as to so much of the equity rule as recognized time as of the essence of the contract by necessary implication, and

has adopted the other branch of the equity rule, that time will not be considered, as of the essence of a contract unless so provided by the terms of the contract. The case of Powers v. Rude, 14 Okla., 381 is overruled on this proposition.

(Syllabus by the Court.)

*Error from the District Court of Pawnee County; before Bayard T. Hainer, Trial Judge.*

*Gardiner Lathrop, Bird S. McGuire, John C. Hughes* and *William C. Forsee,* for plaintiff in error.

*C. J. Wrightsman, W. P. Hackney, Horace Speed,* and *E. L. Fulton,* for defendant in error.

## STATEMENT OF FACTS.

On the 17th day of December, 1900, J. C. Stribling commenced his action in the district court of Pawnee county against R. M. Snyder and George P. Olmstead, to recover judgment for the sum of $155,200.00 damages, and interest thereon for an alleged breach of contract. The contract sued upon was in writing and is as follows:

### "CONTRACT OF SALE.

"This contract made and entered into this first day of Sept. 1900, by and between J. C. Stribling, party of the first part, and R. M. Snyder and George P. Olmstead, known herein as parties of the second part, bears witness that the party of the first part herein has this day sold and does hereby sell and deliver to the parties of the second part, 12700 head of steer cattle situated and located in pastures near Gray Horse, O. T., Of the cattle so sold and delivered 12500 are to be counted out to the second parties. It is agreed that of the cattle so sold not more than four hundred are long two year olds, 7000 are three year olds and 5000

are four year olds and upwards. The said first party also sells to the second party from 3200 to 3500 acres of corn grown this year and now in possession of the said first party near Gray Horse, O. T· Also 1400 acres of cane likewise grown near Gray Horse. Also about 5000 acres of hay grown near Gray Horse. Also from fifty to sixty head of horses and two mules and all wagons, harness and entire camp and ranch outfit of the said Stribling used and employed by him in and about said herd of cattle.

"The price at which all of the foregoing property is sold by the first party to the second party is the sum and consideration of ($500,000.) five hundred thousand dollars.

"It is agreed by the parties hereto that the parties of the second part shall and do hereby pay said consideration to the first party in the manner and mode following: First, that the said second parties shall transfer, sell and convey to the said Stribling their certain ranch in Graham county, Arizona, known as the Coronado Ranch, together with all their cattle thereon known as the *CA* bar herd, together with all horses and all the ranch outfit thereon and said brand.

"It is further agreed and understood that the first party takes said Coronado ranch and said cattle thereon and horses without counting the same. The said ranch and property thereon is transferred to the first party at the valuation of one hundred and fifty thousand dollars, ($150,000.).

"In further payment of the above mentioned selling price the said second parties are to assume an encumbrance on 10500 head of cattle hereby sold to them by said Stribling of two hundred and forty thousand dollars ($240,000)· The balance of said consideration is to be paid by said second parties or accounted for satisfactorily to said Stribling within —— days of the signing of this instrument.

"It is agreed that each seller herein will pay the taxes on the property hereby sold by him or them for the year 1900, and prior thereto, but not afterwards.

"It is hereby agreed that 10500 head of cattle hereby sold by Stribling are wholly free from encumbrance of any kind except as to the said amount of two hundred and forty thousand ($240,000) dollars.

"If it should appear that there is an encumbrance of the remaining 2000 head of cattle hereby sold, such encumbrance shall be deducted from the balance of the purchase price before mentioned.

"The said first party hereby agrees and guarantees that all pasturage on and for said cattle sold by him before mentioned in said pasture has been paid up to and including April 1st, 1901.

"It is agreed that paragraph two herein shall be amended so that the corn, cane, hay and millet, therein embraced shall be described as follows: Wilson farm, 900 acres of corn, 200 acres of cane; Herrige farm, 400 acres of corn, 125 acres of cane; Simpkins farm, 600 acres of corn, 400 acres of cane; Moody farm, 900 acres of corn, 500 acres cane; Brooks farm, 300 acres corn, 200 acres cane. Also all hay and millett grown during the present year on said farms, the exact acreage of said farms not guaranteed·

"It is also agreed that said second parties shall deduct ($2000) two thousand dollars from the amount to be paid by them to said Stribling on account of agent's commission advanced by them growing out of said transactions.

"The brands of the cattle hereby sold by said Stribling to the parties of the second part are as follows:

Uꓒ   Z   $\frac{\mathrm{T}}{\mathrm{Z}}$   -H   -H̲   FE   OV̲   90   KN   $\overset{\wedge}{3}$   S

Jo   PC'   P̄C̄

Said cattle to be counted within fifteen days.

"The said Coronado ranch hereby sold by the second parties to the first parties, includes all the lands owned by said second parties or either of them, in said Graham county,

Arizona, and pertaining to said ranch. The said land to be conveyed by said second parties by warranty deed.

"Witness the hands of said parties the day and year above mentioned.

"J. C. STRIBLING,

"R. M. SNYDER,

"GEO. P. OLMSTEAD."

The plaintiff, Stribling, alleged in his petition that he had fully complied on his part with the terms and requirements of the written agreement but that the defendants had failed and refused to convey to him the ranch in Graham county, Arizona, and had failed to deliver to him the cattle on said ranch known as the *CA* bar herd, together with the horses and ranch outfit, and that said property was of the value of $150,000, and he prayed judgment for the value of said property and interest aggregating $155,200.

Afterwards an amended petition was filed in which the plaintiff claimed an additional balance due upon the original contract of $5,200.

To the amended petition the defendant Snyder filed his answer and cross-petition, which is as follows:

"First: Defendant Robert M. Snyder for amended answer to the amended petition of the plaintiff filed herein, denies each and every allegation therein contained, except such as are herein expressly admitted.

"Defendant Snyder further says that it is true that on the first day of September, 1900, the plaintiff and defendant Olmstead and himself entered into the written contract set forth in the petition, but he denies that the same was in all or any respect duly fulfilled or performed by the plaintiff. Defendant says that the plaintiff failed to deliver the num-

ber of cattle contracted for and that the cattle actually delivered were not of the ages or quality contracted for. Defendant says that there was a shortage in the amount of feed delivered, and that the same instead of being clear was largely encumbered.. Defendant further says that the plaintiff failed to deliver the full number of horses contracted for, and that for all cattle, feed, horses and other property actually received from the plaintiff the defendants have made more than full payment.

"Second: Defendant Snyder further answering and as a separate defense says that on the first day of October 1900, the plaintiff and himself entered into the following contract, supplemental to the contract of the first day of September, 1900, pleaded in plaintiff's petition:

" 'Chicago, Illinois, October, 1st, 1900.

" 'To the Siegel-Sanders Live Stock Commission Co.,

" 'Kansas City, Missouri.

" 'Gentlemen:

" 'The undersigned, R. M. Snyder and J. C. Stribling, parties to a certain contract entered into on the first day of September, 1900, have agreed between ourselves as follows, and we hereby instruct you with reference to the carrying out and final completion of the trade therein described as follows:

" '(1) Whereas 6094 head of the cattle described in said contract have been tallied, branded and separated from the rest of the cattle, it is now agreed that of the remaining herd about 5000 head more or less (the exact number to be determined by yourselves with reference to their fitness for market) shall be immediately shipped to market without counter-branding and said cattle shall be counted as and when they are taken out of the pastures and a record taken of the original brands.

" '(2) When the shipment of said cattle has been completed the remaining herd shall be immediately tallied and

branded in the same manner as the first lot of 6094 have already been, and when all of said remaining cattle have been so branded then the total number branded, together with the number shipped as aforesaid in addition to the 6094, shall be the basis upon which said contract shall be finally settled, and the said Stribling is hereby given the right to deliver the full number of cattle mentioned in the contract, that is to say, 12500, up to the date when the last of said remaining herd is thus tallied and branded shall belong to Snyder.

" '(3) Said Snyder agrees that he will immediately upon the execution of this contract and the delivery thereof to you, pay the indebtedness of $235,000 and the interest thereon to Rosenbaum Brothers and the Company, and that he will also pay to said Stribling or for his account to the parties entitled thereto, a sum not to exceed $110,000, in such sums and at such times as proper releases for the various mortgages and claims now existing against said cattle shall be furnished to him, and the balance of $5000 still remaining to be paid under said contract shall be held by said Snyder until said count has been completed, at which time said $5000 shall be paid over to said Stribling and contemporaneously with the payment of said sum of $235,000 and the interest to Rosenbaum Brothers and Company all of the bills of sale and other evidences of title to said cattle shall be turned over by you to said Snyder.

" 'Said Stribling agrees that upon the full payment of said sum of $110,000 hereinbefore mentioned, he will furnish to said Snyder receipts or proper evidences from all parties having any claim of any kind against any of the said cattle feed.

" '(4) In making the count above mentioned it is understood that the same shall be made under the direction and management of Mr. Sanders of your firm and some one appointed by said Stribling to look after his interests, and all

further expense of counting and branding shall be borne by said Snyder, and no count shall be made unless said Stribling or some representative of his is present to verify and agree upon said count as it progresses. If after said count is completed, the full number of 12500 cattle shall have been turned over, then you are instructed to forthwith deliver to said Stribling all title papers in your possession to the Arizona ranch property. If the full number of 12500 cattle is not counted and turned over within (5) days from the date when said count is completed and said Stribling does not pay to said Snyder at the rate of $37.50 for each and every head of cattle less than the number of 12500 within said five days, then the title papers to said Arizona property shall be forthwith returned by you to said Snyder and said Stribling shall have no further claim against the same, it being the intention hereof that you shall hold said Arizona property as a margin for the protection of said Snyder until said count is completed.

" 'R. M. Snyder.

" 'J. C. Stribling.'

"Defendant says that in accordance with the terms of said contract of October 1, 1900, he paid to Rosenbaum Brothers and Company the indebtedness of $235,000 and interest thereon, being the mortgages outstanding upon the cattle described in the contract of September 1, 1900; that he also paid the sum of $110,000, the amount of the various mortgages and claims existing against the cattle of plaintiff described in the contract of September 1, 1900 and other cattle subsequently purchased by him in attempting to make full delivery of the number called for by said contract, including sundry claims against the feed. Defendant further says that notwithstanding such payments there was a large deficiency in the number of cattle delivered, and that the same were not of the ages and character called for by said contracts.

"Defendant further says that after the count called for in paragraph 4 of the contract of October 1, 1900, was completed, plaintiff not only failed to deliver or turn over the full number of 12500 cattle within five days from the date when said count was completed, but also failed to pay for the deficiency in the number of said cattle at the rate of $37.50 per head within five days.

"Defendant further says that said full number of 12500 cattle has never been delivered or payment made for the deficiency at the rate of $37.50 per head, and that in accordance with paragraph 4 of said contract of October 1, 1900, the title papers to the Arizona property being the same ranch and property of the defendants named in the contract of September 1, 1900 were returned to this defendant and said plaintiff has no further claim against the same. Defendant says that for all cattle delivered under said supplemental contract of October 1, 1900, the plaintiff has been more than fully paid.

"Third: Defendant Snyder further answering plaintiff's amended petition herein, and by way of counterclaim against the plaintiff, states that as an inducement to defendants entering into the contract of September 1, 1900, the plaintiff represented that he had 12700 cattle and the feed and other property therein named, and that only 10500 head of said cattle were encumbered to the extent of $240,000; and that relying upon said representations this defendant took up the mortgage of $240,000 upon said cattle and still holds the same. Defendant says that said representations were false and fraudulent; that said plaintiff did not have 12700 cattle and that the cattle which he delivered under said contract and part of which he bought after its execution, amounted all told to only 10300 head of cattle, and that the same, including the feed covered by the contract of September 1st, 1900, were mortgaged to the extent of $110.000 in addition to the $240,000 named in said contract.

which said sum of $110,000 this defendant was compelled
to and did pay. Defendant further states that he was in-
duced to pay said sum of $110,000 by plaintiff's having cer-
tain of said cattle rounded up and counted twice, so as to
make it appear that he had ready for delivery the full number
called for by said contract.

"Defendant further states that there was unreasonable
delay in the delivery of the cattle that were actually deliv-
ered, resulting in a loss of not less than $5.00 per head
upon all cattle delivered and shipped to market. Defendant
says that in the method employed by the plaintiff in round-
ing up and counting cattle delivered, there was a large shrink-
age in their weight and increased expense incurred by de-
fendant to his large loss and damage·

"Defendant further states that in the contract of Sep-
tember 1, 1900, plaintiff undertook to deliver not more than
four hundred two year old cattle, but defendant says of the
cattle actually delivered by plaintiff 1200 were two year old
cattle, and defendant was thereby damaged in the sum of
$15,000.

"Defendant further says that during the delivery of
the cattle called for by the contract of September 1, 1900,
certain cattle known as Honea & Ferguson cattle number-
ing 1255 head and bearing different brands from those called
for in the contract of Sept. 1, 1900, were delivered to de-
fendants, and discovery of that fact was not made until
after the same had been received and branded by them; that
said cattle were of inferior quality and that it was agreed by
the plaintiff that the same were to be accounted for only
at the average price which they brought when marketed,
that they only realized the sum of $28.00 per head instead
of the agreed price of $37.50 per head, which the plaintiff
was to make good for any deficiency in the number of cattle
under his contract of October 1, 1900; that defendant was
thereby damaged in the sum of $12,000.

12--Vol. 18

"Defendant further says that there was a deficiency in the number of horses, mules and wagons included in the contract of September, 1, 1900, and covered by the Rosenbaum mortgages taken up by the defendant, to his loss and damage in the sum of $3.000.

"Defendant further says that there was a large shortage in the amount of feed covered by the contract of September 1st, 1900, and that by reason thereof the defendant has been obliged to buy additional feed, to his damage in the sum of $15,000.

"Defendant states that by reason of the deficiency in the number and quality and ages of the cattle delivered by the plaintiff under his said contract of September 1, 1900, the defendant has been obliged to carry the same over the winter in order to make them fit for market, to his damage in the sum of $6,000.

"Defendant further states that his co-defendant, George P. Olmstead, has duly assigned and transferred to him all his rights, claims, and demands against said Stribling, growing out of the said contract of September 1, 1900, and all of his rights, claims and demands against the plaintiff growing out of the breach of said contract and of his fraudulent representations and conduct as set forth in this counterclaim.

"This defendant further states that by reason of the premises he has been damaged in the sum of $200,000.

"Wherefore defendant prays judgment against the plaintiff upon his counter-claim for the sum of two hundred thousand dollars and costs.

"Fourth: This defendant, Robert M. Snyder further answering plaintiff's amended petition herein and by way of counter-claim against plaintiff, states: That prior to the time he entered into and executed the contract set forth in plaintiff's petition, the plaintiff with the intention to wilfully deceive and defraud this defendant and George P.

Olmstead named in the petition as co-defendant, falsely and fraudulently represented to them that he, the said plaintiff, was the owner and then held in his possession in the Osage reservation, Oklahoma Territory, 12,700 head of steer cattle; that 7000 head of the same were three years old; that not over 400 thereof were two years old, and that the remainder thereof were 4 years old, and upwards; that all of said cattle three years old and upwards were then in suitable condition for market and were fat and would weigh on an average of 1026 pounds per steer and were of a grade and quality usually known and designated among cattlemen as 'Western Texas cattle.

"That the said plaintiff further represented that he then owned and had in his possession 3500 acres of growing corn, 1400 acres of growing cane, and 5000 acres of hay, all of which was located in said Osage reservation, near the town of Gray Horse.

"That believing said representation to be true, the said defendant George P. Olmstead went with said plaintiff to said Osage reservation and then and there the said plaintiff pretended to point out and show and designate to said George P. Olmstead and one George Hibler, as a repesentative of the defendant herein, portions of said 12,700 head of cattle and portions of said growing hay and grain; that the said Olmstead and Hibler and this defendant were not familiar with said cattle or with said grain, and were compelled to rely for their knowledge of the same upon the statements and representations made by the said plaintiff. That the said plaintiff represented to the said Olmstead and to the said Hibler, that the cattle shown to them were the cattle owned by him and mentioned in said contract of September 1, 1900, and consisted of 12,700 head and that such of the cattle as they had not seen were of the same ages, sizes and qualities as those actually shown, and that all the corn, cane and hay which they, the said Olmstead and Hibler, had not actu-

ally seen and examined, was of the same kind and quality as
that actually inspected by them; that thereafter relying upon
the representations so made by said plaintiff to this defendant
and to said Olmstead, and to their agent, the said Hibler,
and believing the said representations to be true, this defend-
ant and said Olmstead executed the contract, a copy of which
is set forth in plaintiff's petition herein; that thereafter in
accordance with the terms of said contract, this defendant
and said Olmstead sent said Hibler and one Frank D. Rog-
ers, as their agents, to the said Osage Reservation for the
purpose of counting and branding the said 12,700 head of
cattle; and thereafter during the month of September, 1900,
the said plaintiff and said Hibler and said Rogers attempted
to count the said cattle, and did actually count 6094 head of
cattle of various ages, qualities and grades; that the said
plaintiff falsely and fraudulently represented to said Hibler
and to said Rogers that the said cattle so counted and branded
were a portion of the 12,700 mentioned in said contract dated
September 1st. That the said Hibler and said Rogers believ-
ing the statement of the said plaintiff to be true, and relying
thereon as being true, branded and counted the same as
and for a portion of said cattle; that thereafter, after brand-
ing and counting said 6094 head the said plaintiff, for the
purpose of cheating, deceiving and defrauding the defend-
ants herein, represented and pretended to the said Hibler and
said Rogers that he, the said plaintiff, desired to make a
preliminary count of the remainder of the cattle in his pos-
session for the purpose of informing him, the plaintiff,
whether or not he, plaintiff, had a sufficient number of cattle
in his possession to complete and comply with the terms of
said contract, and for said purpose requested said Hibler and
said Rogers to assist him in making said preliminary count;
that complying with said request of plaintiff, the said Hibler
and said Rogers did assist in making the count or pretended
count of a large number of the cattle which the plaintiff held

or pretended to hold in his possession; that during said time the said plaintiff and his agents and employes, without the knowledge of said Hibler or said Rogers, so manipulated and drove said cattle being counted, from one pasture to another in the night time, as to deceive said Hibler and said Rogers and cause them to count or pretend to count certain of the said cattle more than once, and thereby to believe that said plaintiff then had in his possession ready for delivery ——— and ready to be counted under said contract, over and above said 6094 theretofore counted as aforesaid, the further number of 6297 head, making a total of 12,391 head; that thereafter for the said purpose of deceiving, cheating and defrauding this defendant and said Olmstead, the said plaintiff induced said Rogers to state in writing that his, the said Roger's count of plaintiff's cattle, intoto, was 12,391 head.   That immediately thereafter, to wit: on or about the 29th day of September, 1900, the said plaintiff came to Kansas City, Mo., and then and there, for the purpose of cheating, defrauding and deceiving this defendant and said Olmstead, falsely and fraudulently stated and represented to this defendant that he, the said plaintiff, and said Hibler and said Rogers, had made an actual branding count of 6094 head of the cattle mentioned in said contract of September, 1st, and had made a preliminary count of the remainder thereof, and that he, the said plaintiff, then had in his possession ready for immediately delivery in said Osage Reservation. over and above the said 6094 head of cattle theretofore counted and branded, the further sum of 6297 head, besides a large number of other cattle which he, the said plaintiff, had not been able to gather up and count, but which would be more than sufficient to complete the full number of cattle mentioned in said contract of September 1st, 1900; that then and there as further evidence thereof, and for the said purpose of deceiving, cheating and defrauding this defendant and said Olmstead, the said plaintiff

showed and exhibited to this defendant the statement in writing by the said Rogers that his, the said Rogers' count was 12,391 head as aforesaid; that this defendant relied upon said statement and representations so made by the plaintiff and believing them to be true, and thereby induced to and did make and execute the supplemental contract set forth herein, dated Oct. 1st, 1900, and was thereby induced to pay and did pay to Rosenbaum Bros., the full sum of $240,000, the amount of their mortgage on said cattle, and was induced to and did pay the further sum of $110,000 in accordance with the terms of said contract of October 1st.

"And defendant Snyder says that each and every of said statements and representations so made as aforesaid by plaintiff to this defendant and said Olmstead, and to said Hibler and said Rogers, were false and were known by said plaintiff to be false at the time he made them; that in truth and in fact the said plaintiff did not have on or about September 1st, or at any time mentioned herein, 12,700 head of cattle as mentioned in said contract of Sept. 1, 1900, or any greater number than 10,396 head; that at the time said contract dated September 1st, 1900 was executed, he did not have more than 8000 head of cattle; that plaintiff for said purpose of deceiving, cheating and defrauding this defendant and said Olmstead, did not show to said Olmstead or to said Hibler, prior to said first day of September, 1900, any of the cattle owned by him except a cetrain number of the oldest and best cattle described in said contract, and that he did not show them the poorer grades of said cattle, and by reason thereof the said Olmstead and the said Hibler were prevented from knowing or learning what were the true age, weight, quality and grades of the cattle owned by said plaintiff and then being offered for sale to this defendant and said Olmstead. That plaintiff did not then own or have in his possession the corn, cane and hay mentioned in said contract, nor any part thereof except 1,358 acres of growing corn,

659 acres of growing cane, and little or no hay. That this defendant and said Olmstead did not know and had no opportunity of knowing or learning the true condition, age, quality and grade of said cattle, nor the amount of said corn, cane and hay at the times that either of said contracts, to wit: said contract of September 1st, 1900, or said contract of October 1, 1900, was made and executed and did not know the true facts in regard thereto at the time this defendant agreed to pay the sum of $240,000 to said Rosenbaum Bros., or the said sum of $110,000 according to the terms of the .said contract of October 1st, That this defendant and said Olmstead did not learn the truth in reference to said facts until after the execution of said contract aforesaid, nor until after the payment of said moneys as aforesaid. That by reason and because of said deceitful, false and fraudulent statements and representations aforesaid this defendant and said Olmstead were compelled to and did receive from said plaintiff 10,396 head of cattle; that they were not of the ages, weight or quality or grades as represented by the plaintiff, but instead thereof large numbers thereof were of a very poor quality and grade known as Eastern Texas and Louisiana cattle and did not weigh more than 650 pounds per head; that about half thereof were poor and wholly unfit for market; that of said 10,396 head said plaintiff purchased more than 3,000 thereof after the execution of said contract dated September 1st, all of which were of an inferior and poor quality and grade of cattle. That because of the inferior quality, weight and grade of large numbers of said cattle, this defendant has been compelled to and has paid out large sums of money, to wit: more than the sum of ten thousand dollars for labor and expense in caring for and feeding, protecting and maintaining said cattle, and in putting the same in a condition which would allow them to be sold on the market; that because of said false, deceitful and fraudulent statements in regard to the amount of corn, cane

and hay and of the shortage thereof from the amount as represented by plaintiff, this defendant has been compelled to pay out large sums of money, to wit: more than twenty-two thousand dollars for corn, cane and hay for the purpose of feeding, caring for and maintaining said cattle from said first day of September, 1900, until said cattle could be put in a condition which would allow them to be shipped to market; the exact amount paid out by this defendant under said last two items being $32,110.47. That in addition to said $32,110.47 paid out in labor and feed for said cattle as aforesaid, this defendant has paid out the sums of six thousand one hundred and ninety-five and 88-100 dollars for pasturage for said cattle, and fifteen thousand four hundred and sixty-three and 50-100 dollars for interest on sums of money necessary to carry said cattle, besides the sum of three hundred and fifty-six thousand, four hundred and eight and 13-100 dollars to pay the notes given the Interstate National Bank, with interest, to take up the mortgage on said cattle of $240,000 to Rosenbaum Brothers, and to pay the $110,000 under the said contract of October 1st, 1900, making a total of four hundred and ten thousand, one hundred and seventy-eight and 89-100 dollars paid out on account of said cattle. That this defendant has received from the sale of said cattle a total of $291,436.39, which was their full value.

"That by reason of said false and fraudulent and deceitful representations and statements as aforesaid, this defendant has been damaged by an actual loss of money as above set forth in the sum of $119,742.50. That if said cattle had been in numbers and quality as represented by plaintiff, and had been delivered as provided by contract, this defendant and George P. Olmstead would have realized a profit on the same of more than $80,000.

"That said George Olmstead has duly assigned and transferred to this defendant all his rights, claims and demands against said Stribling growing out of the said con-

tract of September 1, 1900, and all of his rights, claims and demands against the plaintiff growing out of his breach of said contract and of his fraudulent representations and conduct, as set forth in this counter-claim.

"Wherefore this defendant, R. M. Snyder, prays judgment against plaintiff upon his counter-claim for the sum of two hundred thousand dollars and costs."

To this answer and counter-claim the plaintiff Stribling filed the following reply, omitting formal parts:

"First: Plaintiff denies each and every allegation of new matter contained in each and every paragraph of said amended answer.

"Second: Plaintiff denies each and every allegation contained in defendant's counter-claims.

"Third: And for further reply the plaintiff alleges that there was no consideration given for the making of the pretended contract of October 1st, 1900, set out in the second paragraph of said amended answer.

"Fourth: And for further reply plaintiff says that at the time of making the contract of September 1st, plaintiff was indebted to Claude E. Wilson, as the trustee of Rosenbaum Brothers & Co., in the sum of $235,000, $215,000 of which there was then due and payable, and which said Claude E. Wilson, as trustee was then demanding payment from plaintiff·

"That on the 5th day of September, 1900, the plaintiff, in order to secure an extention of time for the payment of said indebtedness, which he intended to meet out of the purchase money to be derived under said contract of September 1st, 1900 from the said defendants, and the latter to better assure the said Claude E. Wilson of the payment of the mortgage indebtedness on said property to Rosenbaum Brothers & Co., in said contract of September 1st, 1900, provided,

duly executed their written agreement to the said Claude E. Wilson, which agreement is as follows:

" 'Chicago, Illinois,
" 'September 5th, 1900.

" 'Whereas, J. C. Stribling, Jr., of Llano, Llano County, Texas, on November 3rd, 1899, was lawfully indebted to Claude E. Wilson of Chicago, Illinois, in the sum of two hundred and fifteen thousand ($215,000) dollars and to evidence said indebtedness the said J. C. Stribling Jr., on said date executed and delivered to said Claude E. Wilson, his twenty-two (22) notes as follows: Four (4) notes of twenty-five thousand dollars ($25,000) each: Five notes of ten thousand dollars each ($10,000) : Eleven (11) notes of five thousand five hundred dollars ($5,500) each; and one note of four thousand five hundred dollars ($4,500).

" 'And Whereas, the said J. C. Stribling, Jr., to secure the payment of the aforesaid indebtedness duly executed and delivered a chattel mortgage conveying nine thousand one hundred (9100) head of cattle, which said chattel mortgage was duly recorded in Pawnee county, Oklahoma Territory on the sixth day of November, 1899.

" 'And whereas, on April 3rd, 1900, no part of the aforesaid indebtedness having been paid, the said J. C. Stribling Jr., with one N. A. Thompson, duly executed and delivered to the said Claude E. Wilson their joint nineteen (19) promissory notes as follows: Five (5) notes of ten thousand dollars each ($10,000) due August 2nd, 1900; Five (5) notes of fifteen thousand dollars each, ($15,000) due September 1st, 1900: Three (3) notes of twenty-five thousand dollars each ($25,000.) ; Five (5) notes of seven thousand five hundred dollars each ($7,500) and one note of four thousand five hundred dollars ($4,500) all due October 1st, 1900. The last nineteen notes evidencing the same indebtedness as was evidenced by the twenty-two notes (22) first hereinbefore described, together with twenty-seven thousand dollars

($27,000) additional indebtedness due to said Claude E. Wilson from J. C. Stribling Jr., and N. A. Thompson.

" 'And Whereas, Also on March 1st, 1900 the said J. C. Stribling Jr., duly executed and delivered another mortgage on his farm interests in the Osage reservation, the said last described mortgage having been executed as additional security for a portion of the aforesaid indebtedness.

" 'And Whereas, No portion of the aforesaid indebtedness has been paid or satisfied except to the extent of seven thousand dollars ($7.000) and there is now due to said Claude E. Wilson on the date hereof on account of the aforesaid indebtedness the sum of two hundred thirty-five thousand dollars ($235,000) exclusive of interest on the hereinbefore described notes now overdue as follows $43,000 on account of the $50,000 notes due August 2nd·, $75,000 notes due September 1st, and $117,000 notes due Oct. 1st, as hereinbefore recited.

" 'And Whereas, The said J. C. Stribling Jr., has on September 1st, 1900, contracted to sell, together with other cattle covered by the mortgage first hereinbefore described to R. M. Snyder and Geo. P. Olmstead, both of Kansas City, Missouri.

" 'And Whereas, Said. Snyder desires that the overdue paper herein mentioned, viz: said $50,000 due August 2nd 1900, (having a $7,000 credit thereon,) and said $75,000 due September 1st, 1900, shall be carried in its present shape for a term not to exceed four (4) weeks from date hereof.

" 'Now Therefore, in consideration of the premises and for a valuable consideration this day in hand paid by asid Claude E. Wilson to the said J. C. Stribling Jr., and R. M. Snyder, the receipt of which is hereby acknowledged, it is mutually agreed that the time of payment of said overdue paper, viz: said $50,000 notes due August 2nd, 1900, and $75,000 notes due September 1st, 1900, shall be and is

hereby extended for a term not exceeding four weeks from date hereof.

" ' And the said R. M. Snyder hereby agrees within said four (4) weeks to market sufficient cattle with Siegel-Sanders Commission Company in Kansas City, Missouri, or with any other reputable commission house first approved of in writing by said Claude E. Wilson, and to immediately apply the entire proceeds thereof, exclusively, first towards the payment of said overdue indebtedness of $118,000, together with interest thereon, and the surplus if any of such proceeds he shall at once apply towards the payment of said notes due October 1st, 1900. And the said R. M. Snyder hereby guarantees the payment of and agrees in any event to pay said past due notes of one hundred and eighteen thousand dollars ($118,000) together with the interest thereon, according to the terms thereof, not later than four weeks from the date hereof. And said Snyder further hereby guarantees the full and prompt payment of said nine (9) notes due October 1st, 1908, aggregating one hundred seventeen thousand dollars ($117,000) upon the maturity thereof, and the said Snyder hereby waives any and all notice of any default in the payment of any of the herein described notes and also waives all demand upon him.

" 'Said Snyder futher agrees to furnish said Wilson from time to time immediately upon marketing any cattle as aforesaid, a duplicate account sale of all cattle so marketed, showing their respective brands and prices realized.

" 'It is further hereby mutually agreed that the hereinbefore described mortgages and each thereof now are, and they are hereby recognized to be in full force and effect, in accordance with each and every one of the terms, conditions and provisions therein severally contained, and the said chattel mortgages and each thereof shall be and remain in full force and effect, in accordance with the terms, conditions and provisions thereof, severally, until the said indebtedness of

two hundred thirty-five thousand dollars ($235,000) together with all interest thereon shall be fully paid and satisfied.

" 'It is further hereby mutually agreed that when the said indebtedness, together with all interest thereon, shall be fully paid and satisfied and then, but not until then, the aforesaid chattel mortgages shall be released and canceled by the said Claude E. Wilson and all of the hereinbefore described notes shall be canceled.

" 'It is expressly hereby ·further mutually agreed that nothing herein contained shall in any manner whatsoever directly or indirectly, alter, impair or affect the validity of either of said chattel mortgages or any of the notes herein described.

" ' Witness our hands and seals at Chicago, Illinois, this fifth day of September, 1900.

" '(SEAL.)                    R. M. SNYDER,
" '(SEAL.)                    J. C. STRIBLING,
" '(SEAL.)                    CLAUDE E. WILSON.'

"By the terms whereof the said defendants and said Stribling agreed to pay said indebtedness of $235,000 to said Claude E. Wilson, not later than four weeks from and after September 5, 1900. That on said first day of October, 1900, and immediately prior thereto, plaintiff had duly delivered and turned over to George P. Olmstead and R. M. Snyder all of the cattle and other property purchased by them from this plaintiff, and had then fulfilled and performed all of the terms and conditions of said contract of September 1st, 1900, set out in plaintiff's petition, obligatory upon  this plaintiff to fulfill and perform, and that notwithstanding the same, plaintiff avers that in Chicago, Illinois, on the 1st  day of October, 1900, the said Snyder, while in possession of the plaintiff's said cattle and property as aforesaid, told this plaintiff that unless the latter would sign the certain paper described as the 'contract of October 1st,' in the second paragraph of amended answer, that neither of the said defend-

ants would pay for any of said cattle and property so sold and delivered aforesaid, nor the mortgage indebtedness due thereon so agreed to be paid by the defendants as aforesaid, nor return said cattle and property to the plaintiff.

"That said Claude E. Wilson was then demanding settlement of said mortgage debt; that the plaintiff and the defendant Snyder then well knew that the delay and failure of said defendants to pay said mortgage indebtedness would cause the immediate foreclosure of said mortgages and the financial ruin of this plaintiff; that the said plaintiff was then under the power and control of defendant Snyder, by virtue of the premises, as the said Snyder and the plaintiff both of them well knew and recognized; that under such stress and duress, and not otherwise, and to induce the said Snyder to carry out the obligations of said defendants to make the payments then due under the contract of September 1st, 1900, the plaintiff then signed the paper called the contract of October 1st, 1900, and not otherwise.

"Plaintiff further says that the last named instrument was not signed by him of his own free will and accord, that the said pretended agreement did not then and never has had his free assent but that he was forced and compelled to and did sign the same wholly and only because of the refusal of said Snyder to carry out the obligations resting upon him as aforesaid and to save this plaintiff from financial distress, and as this plaintiff then and now believes, financial ruin.

"Fifth: For further reply, plaintiff alleges and says that the defendant carefully examined, inspected, counted, accepted and received all of the cattle and other property and the plaintiff delivered to the defendant such cattle and other property mentioned in the contract of September 1st, 1900, and the defendants were then in possession of the same thereunder and in accordance with the terms thereof, long before the making of said purported contract of October 1st, 1900, the defendants then and theretofore being well acquainted

with the age, condition, quality, size, value and number of the same, they accepted each and all of the cattle as of the same age, as of the same size, as of the same quality, as of the same value, as in the same condition, and as of the same number as provided for in said contract; and further duly accepted each and all of said cattle as the same and identical cattle provided for and described in said contract and of all the other property therein described and delivered as aforesaid. That by reason of said premises, and the plaintiff relying upon the acts and conduct of the defendant in accepting of the said property as aforesaid, as above set forth, the said defendant and each of them are therefore and thereby estopped from averring, alleging, asserting, claiming or proving that the cattle so received by them are of different age, are in different condition, are of different value, are of different quality, are of different sizes, are of different grades, and are of different number or are of different cattle than those contracted for in said agreement of September 1st, 1900.

"Wherefore, the said defendants are estopped to now set out the defense as to the dealings and actions relative thereto as attempted to be made as herein stated, and are further estopped to offer proof therein."

Owing to the complicated character and length of the pleadings, we have in the interest of accuracy adopted the unusual course of setting them out in full, deeming this safer than to attempt to epitomize.

Upon the issues made by these pleadings, the cause was tried to a jury and a general verdict returned in favor of the plaintiff. There were also submitted to the jury on the request of the parties, almost four hundred special interrogatories to be answered in connection with their general verdict.

The record contains all the evidence and proceedings, and is voluminous and cumbersome, comprising almost two thousand pages of typewritten matter. From the record it appears in a general way, that in the summer and fall of 1900, the plaintiff, J. C. Stribling, was the owner of approximately fifteen thousand head of cattle which were kept in several pastures in the Osage reservation; that he had growing for feed and forage for his cattle and ranch stock several thousand acres of corn, cane and hay upon leased land; that he owned a ranch outfit consisting of horses, mules wagons and other personal property.

The defendants Snyder and Olmstead were the owners of a cattle ranch in Arizona known as the Coronado ranch, at which place they owned several thousand head of cattle and other ranch property. The grazing season of 1900 had up to September been extremely dry in Arizona, and cattle were not thriving and some were reported dying owing to the extreme drouth. The plaintiff Stribling was indebted to Rosenbaum Brothers and Company of Chicago in the sum of $215,000 for money borrowed from them, which was secured by a chattel mortgage upon 9,100 head of his cattle. There was also other indebtedness against him or his property aggregating $110,000. A large amount of the indebtedness from Stribling to Rosenbaum Brothers and Company was due or would fall due about September 1, 1900, and he was anxious to make such disposition of his property as would protect the mortgagees and give him time to realize the money to pay them out of the cattle. Snyder and Olmstead were exercised about the unfavorable conditions in Arizona and apparently anxious to dispose of their interests there.

It appears that both plaintiff and defendants were men of extensive business experience, were engaged in the business of buying, grazing, feeding and handling large herds of western cattle, and were used to handling large sums of money and carrying large credits. None of them were novices in the cattle trade or in making deals of the character which is the subject of this controversy.

After some negotiations through certain brokers, the plaintiff sent a representative to Arizona to inspect the Arizona ranch and property and the defendants sent their representatives to the Osage reservation and inspected the cattle and other property of the plaintiff. Upon the reports of these agents the contract of September 1, 1900 was entered into, and the defendants sent their agents, Hibler and Rogers, to the Osage reservation to assist in counting and to received for them the property described in the contract of September 1, 1900.

On September 5, 1900, the defendant Snyder, in order to procure an extension of the overdue paper given by Stribling to Rosenbaum Brothers and Company and which was a lien upon the cattle sold by Stribling to Snyder and Olmstead, entered into the agreement bearing that date, and Stribling executed the agreement with him. By this agreement Snyder obligated himself to sell enough of the Stribling cattle within four weeks to pay $118,000 of the Rosenbaum indebtedness and guaranteed the payment of the remainder of their claim. The Rosenbaum company agreed to this extension. After the Stribling property had all been delivered, and Snyder or his agents had taken possession of the same, Stribling demanded a settlement and the transfer

13—Vol 18

of the Arizona ranch property. Snyder refused and claimed that the entire number of cattle had not been delivered, and threatened Stribling, who was at that time unable to meet his financial obligations, with financial ruin unless he would agree to a re-count of the cattle and consent to certain other requirements, and upon this requirement the supplemental contract of October 1, 1900, was entered into. In the meantime it appears that the heavens had looked with compassion upon the parched plains of Arizona and the Coronado ranch had been the recipient of copious and cooling showers, while the "beef trust," the supreme dictator and regulator of the market prices of beef cattle, had been using their remorseless cleaver and had materially reduced the value of the Stribling cattle before Snyder could get them to the market.

Snyder, contending that he had not received all the cattle purchased by him under the contract of September 1, 1900, sold the cattle and other property received by him and paid the Rosenbaum notes amounting with interest to $240,000, and paid other liens and claims authorized by Stribling to the amount of $105,000, and refused to pay any other sums or to deliver the Arizona cattle and ranch property: And hence, this action.

Stribling claims that he delivered all the property he sold to Snyder within a reasonable time and without delay on his part, and that he is entitled to recover the value of the Arizonia ranch property and cattle valued in the trade at $150,000, and the sum of $5,000 balance unpaid upon the cash consideration of $350,000. Snyder by way of defense alleges that the plaintiff and his agents falsely and fraudu-

lently misrepresented the character, quality, age, number and condition of the cattle, and also the amount and quantity of the corn, cane, and hay, and other ranch property. He also contends that a fraud was perpetrated upon him by the plaintiff and his agents whereby he was cheated and defrauded in the count of the cattle that were delivered to him, and that he paid out more on account of the liens and demands against the property than he realized from the proceeds of the sales of all the property, and he asks that he recover damages against the plaintiff.

Opinion of the court by

BURFORD, C. J.:    If the verdict and findings of the jury are to stand in this case, there are but few questions for this court to pass upon. Upon the trial of the cause a large number of witnesses were examined, and it is evident that much false swearing was indulged in. Both parties to the action were accused of reprehensible conduct in suborning witnesses, procuring the absence of important witnesses, and in attempting to improperly influence those who did testify. A number of ranch men, cowboys, and persons employed in handling the cattle testified directly contradictorily to each other, and it is doubtful if there were not "sharp practices" and even perjury contributing to aid each side in the controversy. This court is in no position to deal with these conditions. The trial court and the jury had all the parties and witnesses before them; they have passed upon their credibility and upon the weight of the evidence, and unless there is something out of the ordinary to discredit their action, this court must treat it as conclusive.

The jury passed upon every material fact necessary to

support their general verdict, and upon every question of fact set up in the defendant's answer and cross-petition or counter-claim, and not only found a general verdict against the defendant, Snyder, for the value of the Arizona ranch, with interest on said sum, less the value of the shortage found in the amount of corn, cane and hay called for in the contract, and the five thousand dollars balance on the cash payment as claimed by the plaintiff, but they also found every fact against the defendant on the special interrogatories submitted to them.

This court has repeatedly reiterated the doctrine that where there is any evidence tending to support the finding of a jury this court will not disturb the verdict. In order to evade the force and effect of this rule, counsel for plaintiff in error invoke the doctrine announced in the *Southern Kansas Railway Company v. O. P. Michaels,* 49 Kans. 388, where it was held that:

"Where some of the material findings of the jury are against the evidence and others are unsatisfactory, and it appears thereby that the findings have been given under the influence of passion or prejudice, or at least that the jury have not intelligently or fairly considered the evidence, a new trial must be granted so that the facts may be submitted to another jury."

And in *Atchison. Topeka & Santa Fe R. R. Co. v. Wells,* 56 Kans. 222, the same rule is stated. We do not question the correctness or soundness of the law as contended for by counsel for plaintiff in error. But does the evidence satisfy this court that the jury was influenced by passion or prejudice? There was some evidence bearing upon each question

submitted to the jury. Upon some of them there was a marked conflict in the testimony; upon others there was but slight evidence upon which to base a finding. The jury could not but have been impressed with the conclusion that some of the witnesses were swearing falsely and that efforts had been or were being made by persons interested in the results to either procure false testimony or suppress the truth. It was within their province to determine who were the truthful witnesses and to determine which testimony they would treat as reliable and which they would disregard. This would necessarily result in making it appear that some of their answers were against the apparent weight of the evidence. With this mass of conflicts, inconsistencies and contradictions, this court is in no position to say that the jury was unfair and controlled by passion and prejudice, unless there is an absence of reasonable proof tending to support some of the findings returned by the jury. A number of the answers returned by the jury are pointed out in the brief of counsel for plaintiff in error as being of this character, and we are asked to examine them. We have reviewed these findings and the evidence relating to each of them and we find that the jury are not without support in each and every one of them. Of course, we shall not attempt to weigh the evidence and say that the conclusions reached by the jury are correct; they might have answered many of them to the contrary of what they did and there would be sufficient evidence to warrant their finding.

One of the special questions complained of as a very marked evidence of the bias of the jury, is interrogatory No. 59, submitted by defendant, as follows:

"Was there a shortage of 1742 acres of corn?"

To which the jury returned the following answer:

"Evidence not sufficient to determine the exact acreage."

It is argued that only one witness testified upon the subject of the exact acreage of the corn land, and that he testified that he had measured the corn ground and found the acreage to be 1352. While it is true that no witness directly contradicted the testimony of this surveyor, his own evidence showed that he made the measurements in January after the contract was made in September; that he measured the ground from the stubble he found and that he was unacquainted with the farms or the fields where the corn was grown, and that he only measured such fields as were pointed out to him by another person; that he had no personal knowledge of whether the lands he measured were all the lands upon which Stribling had corn the season before. It appeared from his testimony that he made the measurements at the solicitation of a representative of Snyder, and that Stribling was not represented. From this testimony and the other evidence before the jury relating to the peculiar conduct of the parties to the suit and the actions of certain of their agents and representatives in relation to counting and handling the cattle, and the class and character of witnesses produced by them, we can readily believe that the jury could conscientiously say:

"Evidence not sufficient to determine exact acreage."

While the evidence as a whole is conflicting, contradictory and unsatisfactory, there is some evidence tending to

support every finding made by the jury, and ample evidence to sustain the general verdict. This being the case, and it not appearing that the verdict of the jury was influenced by bias or prejudice, we are not warranted in setting aside the verdict upon the weight of the evidence, and it cannot be consistently contended that the special findings do not amply support the general verdict.

The plaintiff in error complains of some of the instructions given by the court. It is contended by counsel for defendant in error that no proper exceptions were saved at the time of the trial, and a number of authorities are cited in support of a proposition that a general exception to a number or series of instructions will not be sufficient, if any of the instructions are correct. The exception in the case at bar is as follows:

"Defendant excepts because they are not the law, to the following instructions given by the court and each and every one thereof," and then follows instructions numbered 5, 6, 7, 9, 10, 11, 12, 13, 16, 17, 18, 19, 28, 41, 43, and 44, signed by counsel for the defendant and allowed and signed by the trial judge. This exception properly saves for review the instructions enumerated therein and is sufficient. *Rhea v. U. S.* 6 Okla. 349, 50 Pac. 992; *Murkly v. Kirby*, 6 Kans. App. 494, 50 Pac. 953; *Lorie v. Adams*, 51 Kans. 698, 33 Pac. 599; *Railway Co. v. Nichols & Co.* 9 Kans. 256; *Bard v. Elston*, 31 Kans. 274; *Railroad C. v. Retford*, 18 Kans. 245; *Dunham, et al. v. Holloway*, 3 Okla. 244, 41 Pac. 140.

Instruction numbered 5 submits the proposition that if one promises another to perform that which he is already

obligated to perform, that such promise of itself is not a sufficient consideration and the promise cannot be enforced. As an abstract proposition the instruction correctly states the law, and it was not error to give it.

Instruction numbered 6 relates to the supplemental contract of October 1, 1900, and charges the jury that if they find that said contract was based upon no consideration independent of what was to be performed in the contract of September 1st, between the same parties, that the last contract is void for want of consideration. We see nothing objectionable in this instruction. If it were held to have been unnecessary, yet it was not prejudicial.

Instructions numbered 7 and 9 relate to the questions of duress and undue influence in the execution of the contract of October 1st, and state the effect upon a contract made without consideration or under duress or undue influence. These questions are regulated by our statutory provisions, and the authorities cited have but little application and are not controlling.

The instruction defining duress and undue influence in the execution of contracts is copied from the provisions of the statute. Wilson's stat. 1903, vol. 1, chap. 15, art. 1, and while such instruction embodies some propositions that have no application to the case, in our judgment the inapplicable provisions were so palpably foreign that they could in no event have been misleading, and hence, not prejudicial.

Appellate courts should see that causes are tried and justice administered according to the forms and requirements of the law, and not hesitate to set aside the verdict of a

jury or reverse the judgment of a court where there has been such a departure from settled forms or requirements as have apparently endangered and prejudiced the rights of any litigant. Upon the other hand, such courts should, for the purpose of upholding the verdicts of juries and the judgments of trial courts, as unhesitatingly disregard all technical errors, or acts or omissions which are so obviously inapplicable as to make it clearly apparent that no injustice was done by reason of such errors. Appellate courts have been too prone to set aside judgments for mere technical and unsubstantial errors or defects in the proceedings without regard to the substantial rights of the parties. This is one of the tendencies that such courts may well abandon, and adopt the safer and more reasonable rule of affirming the judgment of the trial court in every instance where an examination of the whole record makes it apparent that a correct conclusion has been reached and a just judgment rendered, although errors may have occurred in the course of the trial. This is more in harmony with the spirit of our laws and progress.

Instruction numbered 9 complained of, is as follows:

"The jury are instructed that the contract of October 1st, 1900 must govern as to the count of the unbranded cattle, unless you find that said contract is void for having been made without consideration, duress or undue influence."

This instruction is couched in very unfortunate language: the learned trial judge is made to say something that he did not intend. It is apparent that he intended to charge the jury, that, unless the contract of October 1, 1900, was void for having been made without consideration, or

*under* duress or undue influence, that it must govern as to the count of the unbranded cattle; but he is technically made to say that a contract made *without duress or undue influence* is void. The instruction is subject to the further criticism that a contract made under duress or undue influence is treated as void, whereas such a contract is only voidable. Standing alone the instruction is objectionable, but when construed in connection with instruction 8, just preceding it, it is clear that no prejudice could have resulted. In instruction 8 the jury are told that if Stribling, after October 1st, ratified the contract of that date or recognized the validity thereof in the subsequent count of the cattle or in the authorization of payment of money to his creditors or in the receipt of money by him thereunder, then any duress or undue influence was waived, and the contract could not be avoided on account thereof. This cured the mere verbal error in the other instruction, and when the two are read together, as they must be, and considered in the light of the whole record, it is apparent that no injustice could have resulted from the defects in instruction No. 9.

We have carefully examined each of the other instructions given in the case and excepted to by the plaintiff in error, and considered each of them in connection with the issues made by the pleadings and the evidence taken on the trial, and we think they fairly state the law applicable to the issues and evidence; are fair to the complaining party, and we see no reasonable ground for criticism. The testimony covered a very wide range, was conflicting in the extreme, and presented many subordinate and collateral issues, some of which were material and others not· The court

in the lengthy and comprehensive charge attempted to advise the jury as to the law upon all the propositions presented by the pleadings and evidence.

In the light of the findings made by the jury, many of the questions raised by the instructions and contended for by the plaintiff in error, become unimportant. He is concluded by the facts found against him on practically every important issue.

The plaintiff in error earnestly insists and argues at length that the trial court committed reversible error in refusing certain requests for instructions made by the defendant, Snyder, upon the trial of the cause. Request numbered 6 and refused, is as follows:

"If the jury believe from the evidence that the plaintiff did not count out to the defendant 12,500 cattle within fifteen days after the making of the contract, plaintiff cannot recover."

This request was properly refused. The contract and the place of its performance were governed by the laws of Oklahoma. It is provided in sec. 809, chap. 15, art 3, Wilson's Statutes, 1903, as follows:

"Time is never considered as of the essence of a contract unless by its terms expressly so provided."

At common law time was always considered of the essence of a contract but equity followed a different rule. In *Porkin v. Thorold,* 16 Beaver, 59; 22 L. J., C. P. Div., the master of the rolls, Lord Romily, said:

"Upon the first question, whether time was of the essence of the contract, there is no great difficulty in stating the rule, although there may be considerable in applying it to

the facts of the individual cases. At law time is always of the essence of the contract· When any time is fixed for the completion of it, the contract must be completed on the day specified, or an action will lie for the breach of it. This is not a doctrine of a court of equity; and although the dictum of Lord Thurlow, that time could not be made of the essence of the contract in equity, has long been exploded, yet time is held to be of the essence of the contract in equity only in cases of direct stipulation or of necessary implication. The cases of direct stipulation are, where the parties to the contract introduce a clause expressly stating that time is to be of the essence of the contract. The implication that time was of the essence of the contract is derived from the circumstances of the case, such as where the property sold is required for some immediate purpose such as trade or manufacture; or where the property is of determinable character, as an estate for life. It is needless to refer to the authorities, which are numerous, to support these propositions."

This rule has been approved and followed by the English courts in a large number of cases. 6 Eng. Ruling Cases, pp. 536 to 539. And the American courts and text writers have generally adopted this doctrine, except where modified by statutory provisions.

We must assume that the legislature in adopting our statute on this subject, had in contemplation the existing law as it was administered both in courts of law and in courts of equity, and that they intended to abolish the common law rule and to adopt the equity rule in a modified form. In equity, according to the established doctrine of the courts, time was held to be of the essence of the contract only in cases of *direct stipulation,* or of *necessary implication,* and Lord Romily said: "The cases of direct stipulation are

where the parties to the contract introduce a clause *expressly* stating that time is to be of the essence of the contract." Our statute adopts this one branch of the equitable doctrine as the law of this territory, and declares that "Time is never considered as of the essence of a contract unless by its terms expressly so provided." No room is left for cases of necessary implication. The extreme difficulty of applying the equitable rule and of determining what class of contracts make time as of the essence of the contract by necessity or implication, has given the courts much perplexity and has furnished a fruitful field for litigation. Under our statutory rule all doubt is banished, and if the contracting parties desire to make time as of the essence of the contract, they must so expressly stipulate in the contract, otherwise time will not be so considered.

There is nothing in the case at bar that shows that time was intended to be treated as of the essence of the contract, and there was no error in refusing the request of defendants for the instruction numbered 6.

We are aware that there is a decision of this court which is apparently in conflict with the rule here announced. In the case of *Powers v. Rude,* 14 Okla. 381, 79 Pac. 89, this court correctly stated the rule as defined by the American courts, but inadvertently the statute upon the subject was overlooked by the court when the decision was announced, and it was not referred to by counsel in the case, either in argument or brief. In so far as the rule announced in the case of *Powers v. Rude* is in conflict with the statutory provision and of the interpretation of the statute herein announced, said cause is overruled.

The request numbered 8, and refused, embraces statements of fact which make it improper and an encroachment upon the province of the jury. There was no error in refusing it.

Request No. 10, refused, is so manifestly erroneous as a proposition of law that it requires but a suggestion to make it apparent. The effect of the instruction asked was that unless Stribling actually owned 12,500 head of cattle at the time Hibler made the inspection for Snyder, that Snyder was not bound by any such inspection. In the light of the evidence that Hibler was, at the time of the inspection, shown cattle which Stribling afterwards became the owner of and put in his contract with Snyder, this request could not have been given; and in any event, Snyder was bound by the inspection made by Hibler of the cattle, which it was conceded that Snyder, through his agents, sold and marketed. The request was too broad and general to be applicable to the facts before the jury.

Request No. 35, offered by the defendant, is as follows:

"The jury are instructed that there is no evidence of duress in the making of the contract of October 1, 1900, set forth in the answer, and said defense of duress must be disregarded."

One of the acts which, under our statute, may constitute duress is, the unlawful detention of the property of the person executing the contract. Consent to a contract induced by duress occasioned by the unlawful detention of the person's property is not voluntary and will render such a contract voidable. There was some evidence before the jury tending to prove that at the time the contract of October 1, 1900, was executed, Snyder had taken possession of all of

Stribling's property and was detaining it from him and refusing to make the payments provided for in the contract and theatening to ruin Stribling and break him up financially, unless he signed the supplemental contract· This was some evidence of duress, and when there is any evidence tending to support an issue, it is not error to submit the question to the jury. However, in view of the special findings made by the jury, the question of the effect of the contract of October 1, 1900. becomes immaterial. The jury found that before the contract was entered into, Snyder sent his representatives to the Osage Nation and that they made an inspection of the cattle, horses, ranch property, corn, cane, millet, hay and all property which was afterwards included in the contract of September 1, 1900. They further found specially that Stribling or his agents made no false or fraudulent statements or representations to Snyder or his agents as to the kind, number or quality of the cattle or as to the other property and that Snyder relied upon the report of his own agents in making the contract and not anything that he was told by Stribling or his men. They also found that Snyder sent his representatives to the Osage reservation to count, receive and accept the property described in the contract, and that the entire property mentioned in the contract, except a shortage in the acreage of feed, was actually delivered to Snyder's agents and accepted by them on or prior to September 26, 1900, and that at the time the supplemental contract was executed Snyder had undisputed possession and uninterrupted control of all the property described in the contract, except the shortage in feed. It was also specially found that no artifice was resorted to by Stribling or his as-

sistants to cause a wrong count of the cattle; that none of them were recounted or counted twice, and that nothing was done by Stribling to delay or impede the delivery of the cattle. It was also found that the delay in procuring an actual and accurate count of the cattle was occasioned by Snyder and his representatives. It was found that there was a shortage in the acreage of feed, but that there was no intention to deceive; that the fields had been measured and that Stribling gave estimates in good faith. The jury found the value of such shortage to be $9,000, and they gave Snyder credit for this amount. They further found against him upon each specific element of damage claimed by him, and found in favor of Stribling in the sum of $5,200 balance of the $350,000 cash considered unpaid, and the value of the Arizona ranch and property in the sum of $150,000. Upon these findings they found a balance in favor of Stribling of $146,200, with interest on said sum from October 1, 1900, at 7 per cent per annum, and for this aggregate they returned a general verdict in favor of Stribling, and the court rendered judgment on the verdict.

Upon the special findings of the jury and the instructions of the court and requests for instructions refused, we find no reversible error. That the jury may have made mistakes in some of their findings is probable, but the general conclusion reached upon the entire findings is, no doubt, correct.

Counsel are entitled to commendation for the able and exhaustive manner in which this cause has been prepared and presented upon both sides. Owing to the volume of the record and the vast number of authorities cited by coun-

sel, and the length to which this opinion would necessarily have been drawn out, we have refrained from going into every question presented in detail. We have examined the whole case and each alleged error complained of, and while each is not specifically referred to, we have given to each such time and consideration as brings us to the general conclusion that the judgment should not be disturbed.

One of the complaints made by counsel for plaintiff in error is well founded; too many special questions not relating to material facts were submitted to the jury. Questions relating to the character, conduct and credibility of witnesses and to the conduct of parties to the suit should not be presented to the jury for special findings. Many of the questions submitted were not answered, or insufficiently answered, but as no request was made to remand the questions to the jury for fuller or more definite answers before the discharge of the jury, we think the parties should not now be heard to complain of such defects.

If the judgment is wrong, it is because the jury and trial court made the mistake of believing the wrong witnesses and if such mistake was made we cannot remedy it.

The judgment of the district court of Pawnee county is affirmed at the costs of the plaintiff in error.

Hainer, J., who presided in the court below, not sitting; all the other Justices concurring.